# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### January 13, 2015 Session

## STATE OF TENNESSEE v. ADAM WAYNE ROBINSON

**Appeal from the Criminal Court for Davidson County**
**No. 2012-B-1876      Monte Watkins, Judge**

---

**No. M2013-02703-CCA-R3-CD - Filed June 23, 2015**

---

The Defendant, Adam Wayne Robinson, was convicted by a jury of three counts of aggravated sexual battery. The Defendant raises three issues on appeal: prosecutorial misconduct during closing argument, sufficiency of the evidence to sustain the convictions, and cumulative error. During closing argument, the prosecutor improperly commented upon the Defendant's right not to testify and engaged in a persistent pattern of other improper prosecutorial argument. Following a thorough review, we conclude that the prosecutor's comments on the Defendant's right not to testify constitute reversible non-structural constitutional error. Moreover, the record establishes that the prosecutor engaged in a persistent pattern of other improper prosecutorial argument, the cumulative effect of which constitutes plain error. We, therefore, reverse the judgments of the trial court and remand the case for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Reversed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER, and TIMOTHY L. EASTER, JJ., joined.

Patrick T. McNally (on appeal) and Bernard F. McEvoy (at trial), Nashville, Tennessee, for the appellant, Adam Wayne Robinson.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Victor S. Johnson, III, District Attorney General; and Kristen E. Menke and Robert E. McGuire, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

The Defendant was convicted of three counts of aggravated sexual battery[1] by a Davidson County jury following a two-day trial. The trial court sentenced the Defendant to three concurrent terms of nine years and six months. The date and year of the first incident was not known. Based on the testimony, the second and third incidents were alleged to have occurred on February 5, 2012.[2] All three incidents were alleged to have occurred on the grounds of Beechwood Terrace Apartments where the Defendant had worked as a groundskeeper for seven years and where the alleged victim's mother lived.

## I.  Facts

The State called  two witnesses during the trial, B.C.[3] and B.C.'s mother. B.C. testified that she was in the second grade. She was asked, "Can you tell these people listening to you what happened to you?" B.C. answered, "About sexual abuse." She said it happened at her mom's old apartments, "Cedar Ridge Apartments." She said she did not remember how old she was. She said someone touched her in places no one is supposed to touch. Thereafter, the following exchange took place:

> Q. Who did that?
>
> A. Adam.
>
> Q. Do you see Adam in here, in this courtroom, this morning?
>
> A. (Respite)
>
> Q. You can stand and look around.
>
> A. (Witness stands, then nods in the negative.)
>
> Q. You don't see Adam?

---

[1] The indictments allege the offenses took place on a date between August 1, 2011, and February 10, 2012.

[2] The State filed an Election of Offenses at the conclusion of its proof. As to Count Two, the State elected conduct that involved the Defendant rubbing B.C.'s genital area. As to Count Three, the State elected conduct that involved the Defendant rubbing B.C.'s buttocks.

[3] As is the practice of this Court, the child will be referred to by her initials.

A. (Nods in the negative.)

Q. Who was Adam to you?

A. My friend.

In regards to the first incident, B.C. testified that she was riding her bicycle at the tennis courts, which she said she did "all the time," and saw Adam picking up trash. She asked him if he wanted to be her friend, and he said "yes." He instructed her to follow him. She could not remember where they went or when the incident happened. She said, "[The Defendant] told me to pull my pants down and he picked me up and touched me in spots he wasn't supposed to." She said she calls those spots "my private part and my butt." When B.C. was asked about the location of the initial incident, B.C. said it happened at the apartments. In the following exchange, the State pressed B.C. for a more precise location:

Q. Do you know where in the apartments, like, in the complex? Do you remember, were you by the tennis courts? Were you in the grass? Were you riding your bike? Do you remember where that first time happened?

A. No.

B.C. said Adam told her not to tell anyone and gave her a dollar, but she lost it. She said his hands felt cold. Using a stuffed bunny, she described how the Defendant picked her up and put her face on his shoulder. When asked how her legs were positioned, she said, "I think they were dangling down or wrapped around his body." She said she did not remember how his hands got to the skin of her private part or butt.

B.C. was almost seven years of age on February 5, 2012, when the second and third incidents were alleged to have occurred. B.C.'s mother was going to walk their dog, and B.C. was supposed to ride her bicycle on the tennis courts in front of their apartment. She exited their apartment through the rear sliding door. B.C. rode around the side of the apartment building heading to the tennis courts while her mother stayed in the back yard. B.C. rode her bike to where Adam was picking up trash instead of going to the tennis courts. She said Adam told her to follow him, and she followed him on her bike behind an apartment building near a wooded area. She said they were behind an apartment near the patio and sliding glass door. She testified she pulled her pants down to her feet. Again using the stuffed bunny, she showed how Adam picked her up and touched her private parts and butt. She said Adam told her not to tell anyone and gave her a dollar, then she heard her mother yelling so she pulled her pants back up. She said she lost that dollar too.

B.C. rode her bike to the base of the hill, got off, and Adam pushed the bike up the hill for her. B.C.'s mother was on the patio behind their apartment, and according to B.C., when B.C.'s mother saw her, she said, "Does [the Defendant] do anything that he's not supposed to?" B.C. testified that she then told her mother "the story." She said the only other person she told was someone named Gayla, but that Gayla had moved to Texas. When asked about going to the doctor, B.C. said, "No, I didn't even have to go to the doctor." When asked twice if she talked to someone about what happened and drew pictures for that person, she answered "no" both times. B.C. said she watched a video before testifying. She identified two line drawings of a girl with no clothes on, one from the front and the other from the back. When asked if she saw her private parts on the line drawings, she drew a circle and wrote "private part" on the front view and drew a circle and wrote "butt" on the rear view. When asked what Adam did to the two areas circled, she said, "He just rubbed." She said his hands felt cold, but she could not remember if it was cold that day or what she was wearing.

B.C. was shown several pictures of Beechwood Apartments. The first picture showed a portion of the tennis courts in the foreground and, in the background, the apartment building where her mom lived, a trash dumpster, and the apartment building behind which she said the second and third incidents occurred. After looking at the photograph, she was asked again about where the first incident occurred. No verbal answer was given, but the transcript states, "(Drawing on diagram)." It is clear from the record that B.C. was looking at the photograph with the tennis courts in the foreground immediately before this line of questioning. The following examination then took place:

Q. Were you inside the tennis court or outside the tennis court?

A. "Outside."

Q. But standing close to it like that?

A. I was just—right near there where there was grass.

On the right center of the photograph, although it is very faint, appears to be a circle around a grassy area just outside the tennis court fence.

B.C. was then asked:

Q. And, then, do you see in that picture, sort of, near where you were the second time that something happened between you and [the Defendant]?

-4-

A. Same spot.

B.C. then explained the "same spot" was the place where she first saw Adam and then they went behind the apartment building. She said that, from where the second incident happened, she could see the basketball court and the dumpster but not the tennis courts.

On cross-examination, B.C. said she asked her mom if she could ride her bike and her mom told her she could if she would stay at the tennis courts. The following exchange concerned what happened between B.C. and her mother after the alleged second incident:

Q. I know it was a long time ago, and [your age] doesn't matter. You said that she yelled. What do you [mean] by that?

A. Well, she yelled my name.

Q. Okay. When you could see she was mad, were you a little bit frightened?

A. Yes.

Q. Why is that?

A. Because I was afraid that I was going to get whupped by her.

Q. What does "whupped" mean?

A. Like, what my daddy does whenever I do something really bad. He gets his belt and he just hits me with it.

Q. Does mama do whuppings?

A. She doesn't do them. But I was afraid she might.

B.C. testified she watched a video[4] the day before the trial began. Concerning that issue, the following exchange took place:

Q. I want you to think back. Before you watched that video, like, in the car on the way to the courthouse, at that time, did you remember anything about Adam?

_____

[4] The forensic interview video was recorded on February 10, 2012, at Nashville Children's Alliance.

A. No.

Q. Okay, but the video helped? The video put it back in your head, and—maybe I am saying that wrong. Did you remember about Adam when you watched the video?

A. "I'm always—I'm always having Adam in my head. Always."

Q. Okay.

A. He was a good friend until he did what he did. And I trusted him.

Q. Am I right, that you only saw Adam two times; is that right?

A. Yes.

Q. And both of those times he did something to you.

A. Yes.

Later B.C. agreed that Adam was a stranger when she rode her bike to where he was picking up trash before the first incident was alleged to have happened.

B.C. stated that both times she pulled her pants down. She said Adam picked her up with both hands and put her face on his shoulder. He held her in that position with one hand and touched her with the other. She stated that, when he put her down, she pulled up her underwear and pants. After the first incident, she said she got back on her bike and rode around while Adam went back to picking up trash. B.C. said that her pants were pulled down one time each during the two incidents and that Adam did not tell her to pull her pants back down after she pulled them up. B.C. said she does not remember going to the place where the video was made. She was then asked about what she told the interviewer:

Q. In the video, did you tell the woman you talked to that Adam pulled your pants down?

A. I don't remember if I said that I'm the one who did it or if Adam is the one who did it.

Q. Is it hard to remember who did it?

A.  Yes.

Q.  Did you tell that lady that the second time he pulled your pants down you pulled them back up, and then he pulled them down a second time?

A.  I don't remember.  I am not really good with my memory.

B.C. testified that the only person to ever give her a dollar was Adam and that he gave her a dollar two times.  She said Adam never gave both her brother and her a dollar.  She then volunteered about an incident when her mom's friend was getting a new car, and someone at the dealership gave her brother and her a dollar to get something out of the snack machine.  She denied talking to her mother about dollars.  She said she never gave her mother one of the dollars Adam gave her.  She said she lost those dollars.

B.C.'s mother testified first in a jury-out offer of proof by the Defendant concerning an incident that occurred in 2007 when she took B.C. to Our Kids Center and about B.C.'s mother's mental health.  She denied the reason she took B.C. to Our Kids Center was because of concerns that B.C. had been sexually abused by her brother-in-law.  B.C.'s mother admitted that she was bipolar and had a history of manic depression.  The trial court affirmed its previous ruling prohibiting questions about these two issues.  However, the State asked to be allowed to inquire about her bipolar condition since it had been mentioned in opening statement by defense counsel.  The court agreed.

According to B.C.'s mother, February 5 was a dreary and cold Sunday morning.  B.C. wanted to ride her bike, and B.C.'s mother was planning to walk their dog.  She and B.C. exited the sliding glass door at the rear of the apartment together.  B.C. was going to ride on the tennis courts.  B.C.'s mother said "that's where all the kids congregated and played."  After walking the dog in the back yard, B.C.'s mother walked around to the front of her apartment building to check on B.C.  She did not see B.C. at the tennis courts.  After taking the dog back inside, she continued looking for B.C. in front of her apartment.  After calling her name several times, B.C. came from behind the adjacent building pushing her bike.  She was accompanied by the Defendant, whom she identified in court.  B.C.'s mother was angry and yelled at B.C. for not being at the tennis courts.  The Defendant told B.C.'s mother that B.C. had followed him around to the back of the building where he was cleaning up.  B.C.'s mother said she "dismissed [the Defendant] and told him that I wasn't speaking to him[.]"  She continued yelling at B.C. and told her to go back around the building and go into their apartment through the sliding door.  According to B.C.'s mother, she walked to the rear of the apartment and apologized to B.C. for yelling at her and told her she was afraid because she did not know where she was.  She asked B.C., "Has [the Defendant] ever done . . . anything inappropriate?"  According to B.C.'s mother, B.C. said, "He touched my bottom

and my private." B.C.'s mother noticed B.C. had her hands pulled up into her heavy coat and told her to pull them out. B.C.'s mother said B.C. was holding a crumpled up dollar bill in her left hand. The two went into the apartment, and B.C.'s mother called the police. She said she let B.C. keep the dollar.

B.C.'s mother said she spoke to the Defendant again on February 5 after calling the police. She was taking out the trash when the Defendant walked up from the parking lot and said, "I didn't mean to get [B.C.] in trouble. I, actually, thought y'all lived in that building, so I didn't realize she was so far away. I didn't know she was supposed to be on the tennis courts." B.C.'s mother said, "Well, she knew where she was supposed to be." B.C.'s mother did not tell the Defendant she had called the police.

B.C.'s mother said the only conversation she ever had with the Defendant before February 5 was at Quiznos, where she worked. The Defendant was placing an order and she recognized him. She told him, "My son is jealous, because you gave my daughter a dollar and he didn't get one." She said he looked confused so she repeated what she said, and he responded, "Oh, you're [B.C.'s] mom?" B.C.'s mother said B.C. had said that "her friend" gave her the dollar and that she had pointed out the Defendant. B.C.'s mother said that on one occasion after the Quiznos incident, B.C. and her brother both came in with a dollar.

On cross-examination, B.C.'s mother stated she was angry that B. C. was not where she was supposed to be and she yelled at B.C. She said B.C. was dressed appropriately for the weather, including a winter coat, blue jeans, and warm shoes. She said when B.C. came up from behind the building her clothes were not "disarranged" and her pants were buttoned and zipped. She said because of the tone of her voice, B.C. would have probably been frightened and scared "for that moment." B.C.'s mother agreed there were other people in the complex that walk their dogs during the day. She said she usually ran in to the same three or four people walking their dogs, usually in the rear of the apartment buildings.

Metropolitan Nashville Police Department ("MNPD") Officer John Jackson came to B.C.'s mother's apartment within an hour following the report of the February 5 incident. When B.C.'s mother was asked about what she told Officer Jackson, the following exchange took place:

Q. Did you tell him that [B.C.] told you that [the Defendant] looks at her bottom and looks at her private?

A. I am not entirely sure if that is the exact wording. She did tell me that he touched her, or looked at her, at that time. At that time, that's what I was told.

. . .

Q. But you don't recall [B.C.'s] answer as well.

A. I really—I really do recall. I think—I'm pretty sure she said, "He touched my bottom." And to which I responded, "Is that all?" And, she said, "And my private."

B.C.'s mother was also asked about her telephone conversation with Metro Nashville Police Department ("MNPD") Detective John Farrell, in the following exchange:

Q. Did you tell Detective John Farrell, on the very next day, that [B.C.] told you that [the Defendant] looks at her bottom?

A. I'm not sure exactly what the exact phrasing was. I am not even, really, sure it was the very next day. I know that a few days passed before the incident and the time anything was in motion. I wasn't contacted by DCS, or anything, for several days. So, I am exactly sure [sic] what day I spoke with Detective Farrell.

The following concerns the conversation with Detective Farrell, as well as the conversation with Officer Jackson:

Q. [B.C.'s mother,] is it possible that both of those two police officers you spoke to, one in person and one on the telephone, you told them that [B.C.] said [the Defendant] looks at her and you did not use the word "touching"?

A. That's possible, yes.

Q. Would that be because, when you first questioned [B.C.], she talked about looking and not about touching?

A. If that is what I told them, then, that is what she told me.

B.C.'s mother took B.C. to the Nashville Children's Alliance on February 10, 2012, for a forensic interview and to Our Kids Center for a medical examination several days after the incident. She told the counselor at Our Kids Center that she had a "gut feeling" about the Defendant when her daughter came out from behind the building.

The Defendant called MNPD Detective John Farrell as a witness. Detective Farrell contacted B.C.'s mother by phone on February 6. He testified she told him that she saw B.C. and the Defendant come from behind a building and that B.C. told her the Defendant "pulled her pants down and looked at her bottom." He said there was no mention of touching. Detective Farrell attended a forensic interview on February 10 at Nashville Children's Alliance. He stated B.C. first described an incident at the tennis courts in which the Defendant touched her bottom and penetrated her vagina with his finger. B.C. described a second incident in which she was riding her bike and the Defendant followed her behind a building and pulled her pants down. B.C. pulled her pants up, and the Defendant pulled them down again and penetrated her vagina with his finger. B.C. said that, after the second incident, she asked for a dollar and the Defendant gave her one and told her this was "our little secret." Detective Farrell stated he was not aware of any medical evidence of sexual abuse. He also stated that he asked B.C.'s mother to wear a body wire and speak with the Defendant. B.C.'s mother initially agreed but changed her mind because "she wasn't going to be able to do it because she couldn't miss work."

The defense next entered the 45-minute recording of the February 10 forensic interview as an exhibit and played the recording for the jury. The jury was provided a transcript of the recording and properly instructed that the recording itself and not the transcript was evidence.

Juanita Freudenthal, the Defendant's grandmother, testified that the Defendant moved to Beechwood Terrace Apartments with his disabled mother and became the groundskeeper about seven years ago. She stated she visited Beechwood Terrace Apartments at various times at least twice a day to help the Defendant's mother. She would drive around until she found the Defendant. She said the Defendant usually worked a couple of hours on Sunday mornings and that she and her husband would pick up the Defendant every Sunday to go to lunch at Cici's Pizza. She said the Defendant's mother wrecked his car and that he did not have transportation for about six months before the February incident. She testified that February 5, 2010, was Super Bowl Sunday and they planned to pick up the Defendant a little early to go to Cici's Pizza so they could be home for the pre-game activities. She testified her grandson was a fine young man and she had never known her grandson to do anything inappropriate to a child.

Over the objection of the State, the trial court allowed Mrs. Freudenthal to testify about a conversation she had with the Defendant concerning the incident. The trial court found the State had opened the door by asking Mrs. Freudenthal about the conversation during cross- examination and under the rule of completeness allowed Mrs. Freudenthal to tell the jury about the conversation. Mrs. Freudenthal had asked the Defendant why he was not wearing his uniform. The Defendant initially told her his uniform was at the cleaners.

Two or three days later, Mrs. Freudenthal asked the Defendant why he was not working, and he told her "someone came to the [Beechwood Terrace Apartments] office and said that I touched a little girl . . . ." She asked him how, and he said they said "I had patted her on the butt." He told her he "didn't do that."

John Williams, a sixteen-year resident of Beechwood Terrace Apartments, testified that he had known the Defendant since 2006. Mr. Williams retired after 39 years as an air traffic controller and was the Air Traffic Facilities Manager at the time of his retirement. His wife is disabled and confined to a wheelchair, and he had two back surgeries and a stroke and sometimes needed help to carry out the trash or walk his two dogs. He said the Defendant, over the years, had helped him with such tasks when he was not able to do them. The Defendant had a key to his apartment and would take care of his dogs when he was out of town. He said he considered the Defendant a friend and trusted him completely and that, even though there were valuables in his apartment, he had no hesitation about providing the Defendant with a key when he was out of town. He said he could not remember ever seeing the Defendant with a child and that the Defendant had never said anything inappropriate about children.

Mr. Williams said that when his health is good, he walks his dogs four or five times a day around the eastern and northern periphery of the apartments, which he described as the grassy area behind F and G buildings that was designated as the "dog walk area."[5] Mr. Williams estimated there were at least six to eight other renters who walked their dogs in that area. He saw the Defendant "a couple of times a day" at various times and places during his walks. He said the routine for walking his dogs varies, but it is typically morning, mid-morning, noon, mid-afternoon, and late evening. He walks the dogs in the morning, between 7:00 and 9:00.

On cross-examination, Mr. Williams said he lived in B building and did not know B.C. or her mother, or where they lived. He said that, on the morning of February 5, his wife was in the hospital. He had previously made arrangements to have new carpet and flooring installed and to have his apartment painted. Mr. Williams returned home around eight in the morning after visiting his wife. His brother was there to help move furniture. As previously agreed, the Defendant arrived around 9:00 a.m. and worked until noon. Mr. Williams said he was certain of the date because he transferred his wife to a skilled nursing facility for rehabilitation the next day, which was the Monday after the Super Bowl, and because the painters came around noon Sunday and had wanted to be through in time to watch the game.

_____

[5] F and G buildings are the buildings where B.C. and her mother lived and behind which the second and third incident allegedly occurred.

Mr. Williams said he learned about the accusations approximately three weeks after the alleged incident. He saw the Defendant's grandmother talking to the apartments' maintenance man and stopped to see what was going on. Mr. Williams told the Defendant's grandmother to tell the Defendant to let him know if he could help. The Defendant later contacted him. Mr. Williams told the Defendant to look him in the eye, and then he asked the Defendant if the allegations were true. The Defendant said "no." Mr. Williams said that "was adequate and sufficient for me."

Heather Williams was the property manager at Beechwood Terrace Apartments from 1988 through 2009 and again from October 2011 through February 2012. She said there were 300 units and approximately 900 residents at Beechwood Terrace Apartments. Including herself, there were six employees. She said the Defendant took care of all ground maintenance, including the pool and the breezeways. She said he worked Monday through Friday and two hours on Sunday. Ms. Williams said residents had to fill out a form to have a dog or cat and pay pet fees. She estimated that there were forty to fifty pet owners and that at least one-half of the owners had dogs.

Ms. Williams said she was first contacted about the incident while she was on vacation in New Orleans. When she returned, she met with B.C.'s mother, who was one of the few residents she did not know or recognize. B.C.'s mother asked if she knew about the incident, and Ms. Williams said she did. B.C.'s mother wanted to know if the Defendant had been fired and if he would be evicted. Ms. Williams referred her to the property management company. Ms. Williams said the conversation with B.C.'s mother "immediately just kind of went, oh, okay, well, I understand completely, no problem, how are things, how was your trip, I heard you went on vacation." She said B.C.'s mother seemed "bubbly and unconcerned." Ms. Williams said she worked with the Defendant everyday, Monday through Friday. She never saw the Defendant harm a child or behave or speak inappropriately with a child. She said he was an excellent employee, friendly and lighthearted. She said that, when she agreed to again manage the apartments for new owners, part of the agreement she had with the owners was that the maintenance staff would be retained. She stated that the decision to terminate the Defendant's employment came down from the corporate management company.

Ms. Williams said Mrs. Freudenthal was a regular visitor at the complex and would often bring breakfast or lunch to the Defendant. She said the Defendant was usually waiting at the office door for his paycheck.

On cross-examination, Ms. Williams stated that the Defendant set his own schedule on Sundays but that he usually worked in the morning. She stated, "[The Defendant] had worked there long enough we let him, you know, choose his hours" and "he was trustworthy

to do so." When asked if, at the time she returned to manage the apartments, she "more or less vouched for [the Defendant] as a good employee and trustworthy person[,]" Ms. Williams stated, "Absolutely." She was then asked if she "had any problem with doing that," and she said, "None whatsoever." She said she personally liked the Defendant and had valued him as an employee.

Detective Farrell was recalled by the Defendant and questioned about a recorded statement he had taken from the Defendant on February 12, 2012. The fifty-six-minute recorded statement was then played for the jury. Near the beginning of the recorded statement, Detective Farrell tells the Defendant that there have been a number of complaints by parents about the Defendant. When questioned at trial, Detective Farrell stated that was not true; there was only a single allegation. Detective Farrell stated one technique used in interrogating a subject is to try to convince them that the proof is overwhelming. Detective Farrell told the Defendant that, when a six or seven year old makes an allegation and is interviewed by experts, he can tell one hundred percent of the time if a child is making it up and B.C. was not making it up. Detective Farrell repeatedly stated he was very experienced in investigating these type cases and that he believed something happened to B.C. and that the Defendant was lying to him. Detective Farrell stated that, even with the techniques he used, the Defendant vehemently denied any inappropriate acts with children and denied giving any kids money. He admitted that B.C. followed him on her bike to the area around the dumpster. He heard her mother yelling and walked B.C. to her mother. He said B.C.'s mother was very angry that B.C. was not where she was supposed to be and was screaming at her. Detective Farrell stated the Defendant never told him about going to Mr. Williams's apartment to help him move furniture.

Based upon this evidence, the jury convicted the Defendant of three counts of aggravated sexually battery. The trial court subsequently sentenced him to nine years and six month to the Tennessee Department of Correction as a Child Predator. This appeal followed.

## II. Analysis

### Prosecutorial Misconduct

On appeal, the Defendant cites numerous comments, divided into six categories, made during the State's closing argument that he claims were improper. Specifically, the Defendant claims that the prosecutor: (1) asked the jury "to send a message"; (2) vouched for the credibility of the State's witnesses; (3) berated defense counsel; (4) argued matters outside the record and speculated; (5) made erroneous statements of law as to the burden of proof; and (6) commented upon the Defendant's right to remain silent and not testify.

The State argues that the Defendant made a contemporaneous objection in only two[6] of the alleged instances of prosecutorial misconduct. As to the instances of prosecutorial misconduct that elicited an objection, the State argues that the Defendant failed to demonstrate that they constituted reversible error. As to the instances for which there was no objection, the State argues that the Defendant waived the issue or, in the alternative, that the Defendant failed to show he is entitled to relief under plain error review.

**Types of Error in Harmless Error Analysis**

When an issue arises concerning improper prosecutorial argument, this court must first determine the type of error, if any, that was committed so that the correct legal standard for review can be applied and, if applicable, whether the error is harmless. As our supreme court has stated:

> All errors are not the same, nor do they have the same effect on the judicial process in general or on a particular trial. Accordingly, for the purpose of the harmless error analysis, this Court has recognized three categories of error—structural constitutional error, non-structural constitutional error, and non-constitutional error. *State v. Powers*, 101 S.W.3d 383, 397 (Tenn. 2003); *State v. Garrison*, 40 S.W.3d 426, 433-34 (Tenn. 2000); *State v. Harris*, 989 S.W.2d 307, 314-15 (Tenn. 1999). The distinctions between these categories of error are more than academic because they define the standards that the appellate courts use to determine whether each category of error can be harmless.

State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008). Structural constitutional error requires automatic reversal. Non-structural constitutional error does not require automatic reversal but shifts the burden to the State to prove beyond a reasonable doubt that the error is harmless. Non-constitutional error places the burden on the Defendant to prove "that the error more probably than not affected the judgment or would result in prejudice to the judicial process." Rodriguez, 254 S.W. 3d at 372.

**Non-structural Constitutional Error—
Comments on the Defendant's Right to Remain Silent**

As stated above, the Defendant made a contemporaneous objection four times during

_____

[6] Our review of the record shows that the Defendant actually objected four times during closing argument. None of the Defendant's objections were specifically sustained or overruled. Responses to objections by the trial court such as "it is argument," "I know," or "move on," without instruction to the jury as to how to handle the objected to argument, must be viewed as the trial court overruling the objections.

the prosecutor's closing argument. One of these objections came after the prosecutor made the following statement, which the Defendant contends was an improper comment on his right to remain silent:

> [Counsel for State]: She [B. C.'s mother] has got her sensation and that's what she testified to on the witness stand. She wasn't behind building H. She saw them coming up from behind the dumpster, coming from someplace that that man had no business being with a six year old girl. What in the hell was he doing behind that apartment building. What were they doing. If they weren't doing what [B.C.] said they were doing, what were they doing, because he hasn't offered any explanation for that through any of his witnesses.

> [Counsel for Defense]: Objection, Your Honor. If I may approach on this occasion?

> [Counsel for State]: It's closing argument.

> The Court: I know what it is. All right. Let's approach.

> [Counsel for Defense]: No, no. I don't want to make a speaking objection.

Immediately following this objection by the Defendant and a sidebar conference, the prosecutor continued in the same vein:

> [Counsel for State]: [The Defendant] obviously doesn't have to testify. Everybody knows that, right. We have all been told that since jury selection. I'm not talking about his testimony. I'm talking about the witnesses from the witness stand. He chose to put on proof, and he didn't offer you any proof from any of those witnesses as to what else was going on and what he was doing with B.C. He chose to play his statement. He didn't offer Detective Farrell in that connection. He doesn't have to, once again, but he didn't.[7]

Both the United States Constitution and the Tennessee Constitution "guarantee criminal defendants the right to remain silent and the right not to testify at trial." State v. Jackson, 444 S.W.3d 554, at 585 (Tenn. 2014). The Tennessee Supreme Court has

---

[7] The sidebar conference that preceded this remark was not transcribed, so what led the prosecutor to make this comment is speculation.

previously cautioned that "[t]he subject of a defendant's right not to testify should be considered off limits to any conscientious prosecutor." Id. at 586 (quoting State v. Hale, 672 S.W.2d 201, 203 (Tenn. 1984)) (internal quotation marks omitted). In addition to direct comments on a defendant's decision not to testify, "indirect references on the failure to testify also can violate the Fifth Amendment privilege." Id. at 587 (quoting Byrd v. Collins, 209 F.3d 486, 533 (6th Cir. 2000)) (internal quotation marks omitted).

In Jackson, our supreme court overturned a second-degree murder conviction where the prosecutor, during closing rebuttal argument, "walked across the court room, stood in front of [the d]efendant, gestured toward her, and demanded in a loud voice, 'Just tell us where you were! That's all we are asking, Noura!'" In its ruling, the court adopted a two-part test for determining whether a prosecutor's remark amounts to an improper comment on a defendant's constitutional right to remain silent and not testify. Id. at 587-88. The two-part test analyzes: "(1) whether the prosecutor's manifest intent was to comment on the defendant's right not to testify; or (2) whether the prosecutor's remark was of such a character that the jury would necessarily have taken it to be a comment on the defendant's failure to testify." Id. at 588.[8] This court reviews a defendant's claim of impermissible prosecutorial comment on the right not to testify de novo. Id.

After reviewing the allegedly improper remarks made by the prosecutor in this case, we conclude that, regardless of the prosecutor's intent, the prosecutor's remarks are of such a character that the jury would necessarily have taken it to be a comment on the Defendant's failure to testify. The prosecutor asked the jury what the Defendant and B.C. were doing behind the apartment building and then stated, "If they weren't doing what [B.C.] said they were doing, what were they doing, because he hasn't offered any explanation for that through any of his witnesses." Following a bench conference, the prosecutor continued to argue that the Defendant did not offer any proof about "what he was doing with B.C." The State contends that these remarks were "commentary on the proof the [D]efendant chose to present at trial and not on the [D]efendant's choice not to testify." However, "a prosecutor's comments on the absence of any contradicting evidence may be viewed as an improper comment on a defendant's exercise of the right not to testify when the defendant is the only person who could offer the contradictory proof." Id. at 586 n.45. Clearly, based upon the proof at trial, only the Defendant could have offered testimony to rebut B.C.'s claim about what had happened behind the apartment building. No one else was present behind the apartment building at the time of the alleged offense. In addition to directly referencing the Defendant's failure to testify, the prosecutor further emphasized the Defendant's silence at trial by repeatedly reminding the jury that the Defendant did not have to testify. See Hale,

---

[8] Although we recognize that the Defendant's initial brief was filed before the release of Jackson, neither the State nor the Defendant in a reply brief cites to Jackson.

672 S.W.2d at 201-02 (reversing a conviction based upon a prosecutor's statement advising the jury that the defendant has a right not to testify and that the jury should not consider the defendant's silence at trial against him). In this case, the prosecutor's argument directly referenced the Defendant's failure to testify several times and implicitly invited the jury to use the Defendant's silence as a tacit admission of guilt. Thus, we conclude that the prosecutor's argument violated the Defendant's constitutional right not to testify.

We must next consider whether the State has established that this non-structural constitutional error was harmless beyond a reasonable doubt. See Jackson, 444 S.W.3d at 590-91 (applying the constitutional harmless error doctrine from Chapman v. California, 386 U.S. 18, 24 (1967), to improper prosecutorial comments on the Defendant's right to remain silent). When assessing whether the State has met this burden, courts should consider "the nature and extensiveness of the prosecutor's argument, the curative instructions given, if any, and the strength of the evidence of guilt." Id.

Considering the record as a whole, we cannot conclude that the prosecutor's unconstitutional argument was harmless beyond a reasonable doubt. The prosecutor's argument directly and indirectly referenced the Defendant's failure to testify several times. Moreover, the trial court provided no curative instructions to the jury following the Defendant's objection to the prosecutor's improper remarks. Finally, the evidence of guilt in this case was certainly not overwhelming. At trial, B.C. could not identify the Defendant as the person who had sexually assaulted her. Additionally, what B.C.'s mother claimed B.C. initially told her and what B.C's mother reported to the police did not correspond with B.C.'s trial testimony. B.C.'s testimony about the details of the two incidents also differed somewhat from the statements in her forensic interview. The jury was aware of these discrepancies because the defense called the detective that investigated the case as a witness and played B.C.'s forensic interview for the jury. Under these circumstances, the State has failed to show that the prosecutor's unconstitutional argument was harmless beyond a reasonable doubt. We, therefore, reverse the Defendant's convictions and remand for a new trial.

### Non-constitutional Error—Other Improper Prosecutorial Arguments

In addition to the prosecutor's comments on the Defendant's right not to testify, the Defendant cites numerous other examples of prosecutorial misconduct in closing argument.

A. *Send a message*. The Defendant claims that the State improperly asked the jury "to send a message" in the following arguments:

1. [Counsel for State]: I knew if I told the truth there wouldn't be anything to worry about. The guileless heart of a child saying at six years old what happened to her. "If I tell the truth, there's nothing to worry about." That's what [B.C.] said, and today you will find out if she is right. Because she's looking to you to let her know that everything is going to be okay.

2. [Counsel for State]: I told you in opening statement that her truth was what was most important, right. [B.C.'s] truth. What she says from that witness stand. Send her a message that you believe her truth, that she did the right thing by telling. Send that message with a conviction.

3. [Counsel for State]: Here's what we do, Ladies and Gentlemen. We put out public service announcements to tell children to tell if something is happening to them. Because sexual abuse occurs in private. It doesn't happen in the open eye, that's true, but it certainly can happen in public places. And we worry about that. It happens with coaches at ball fields. [Counsel for Defense] talked about that. We tell them to tell because we are worried about the youth pastor at church. Right there in church in the middle of everybody. We are worried about the teacher at school. We are worried about the Boy Scout leader, the Girl Scout leader. We tell them to tell because we know that it happens right under our noses all the time. And the only way we are going to know about it is if they come forward and give us the information. That's it. They have a right to be believed. And, you know, we don't know that is happening to them if they don't tell us.

And so what [Counsel for Defense] and [the Defendant] want you to do is say, "well, you know, thanks for coming forward, I'm so proud of you, I'm glad you spoke up for yourself, I'm glad you said your Boy Scout leader is diddling you, but you don't have any proof. Your word in not good enough. We're not going to accept that at face value. You have got all of these reasons to lie and all of this stuff. So sorry.["] It flies in the face of everything you know. It's not reasonable. It's a ridiculous hypothesis.

4. [Counsel for State]: Send [the Defendant] a message that all of the dollars in the world are not enough to buy a child, to buy silence, to buy open season as a pedophile. Convict him because you know in your heart to a moral certainty that he is guilty of everything that [B.C.] says he did.

-18-

*B. Vouching for a witness.* The Defendant contends that the prosecutor improperly vouched for the State's witnesses by making the following arguments:

1. [Counsel for State]: I have an ethical obligation to be truthful and honest in my charging decisions. I can't put an indictment in front of a Grand Jury unless I believe in this case.

[Counsel for Defense]: Objection.

[Counsel for State]: It was open season on my ethical conduct, Your Honor.

The Court: I know.

[Counsel for State]: I'm responding to that.

The Court: All right. Move on.

2. [Counsel for State]: The question that [Counsel for Defense] asked of B.C. was, "did you remember about Adam in the car yesterday on your way to the courthouse?" That's the question he asked. There was never a more literal child than B.C. She answered that question no. I would submit to you, based on what you have seen and witnessing B.C. yourself, that if I had picked up my cell phone and called her while she was in the car on the way here she would have talked to me about it.

3. [Counsel for State]: So here's what B.C. got out of it, according, you know, to the defense. She got out of trouble. So we'll count that. She got to miss afternoons playing outside to talk to forensic interviewers. She got to go to Our Kids and get naked and have somebody probe around in her private parts looking for evidence they weren't going to find. She got to come to the District Attorney's Office and meet with me in preparation for trial, miss school, miss afternoon activities. She got to sit in this courthouse on the fourth floor for a full day on Monday out of her comfortable—out of her comfort zone, none of her own toys, none of her own things to do, none of her favorite foods, all day long on Monday. She got to come up here on Tuesday morning and get in that chair and subject herself to cross-examination from [Counsel for Defense] that she couldn't possibly anticipate. I had no idea what he is going to ask her. I can't prep her for that. And Lord knows if I could, then they would be saying I coached her, because it would never be enough.

-19-

*C. Burden of proof.* The Defendant cites the following arguments as erroneous statements of law, in which the prosecutor asserted that the burden of proof was on the Defendant:

    1. [Counsel for State]: . . . [Y]ou don't have to go back there and say, "I am 100 percent certain that I am right under the law." What you have to do is believe it in your heart. Believe the guileless heart of a now eight year old little girl, who was almost seven years old at the time . . . the little girl who marched up here with the only friend in her room being a stuffed rabbit . . .

    2. [Counsel for State]: So, you know, along with the kitchen sink that's being offered, we have this idea that was introduced to you during opening statements that [B.C.'s mother] is somehow a lunatic who has some diagnosed psychiatric illness that has enabled her to question her daughter in such a manner to elicit the responses that she wants. That's what [Counsel for Defense] told you in opening statements. This woman is so calculated she knows how to get the question out and get the answer in and manipulate her daughter because she wants to hear her say she has been sexually abused. That's what she wants. But noticeably there was really no proof other than that offered by the State about her mental health. And there was certainly no proof that on February 5, 2012, it was in any way impacting her ability to see what was going on, to describe what she perceived, to report to the police, that she brainwashed her daughter into these allegations. Not a single piece of proof about that.

*D. Matters outside the record and speculation.* The Defendant asserts that the prosecutor improperly argued matters outside the record and speculated on evidence in the following comments:

    1. [Counsel for State]: She's probably fidgeting away from the man who's holding her like this wanting to pull her pants up and he's like, "no, come here, I want to finish what I am doing. I want to finish touching you."

    2. [Counsel for State]: B.C. doesn't know the date that the first incident occurred. She doesn't. You know, she doesn't have to because the date is not an element of the offense. She doesn't have to say this occurred on this specific date. . . . What she does know is that she met up with him in front of the tennis courts and he said, "follow me," and so she did. She followed him to someplace that was unfamiliar to her. Probably a place where he knew it would be safe to touch her, and probably on a Sunday morning because that's when she had visitation. That's when he was outside working. And

probably when he knew nobody else would see what was going on.  He was in the power position.

    3.  [Counsel for State]:  If you looked us up in the dictionary we would probably be opposites.  [Referring to herself and B.C.'s mother.]  She is not the person that is going to put on a body wire and interview [the Defendant].  She probably really wanted to do that.  She probably really wanted to do whatever it would take to help her daughter.  But when she thought about it and really processed through it she knew that wasn't something that she was going to be able to pull off.

    4.  [Counsel for State]:  So you can just envision how that conversation went down when [B.C.'s mother] goes in there to talk to Ms. Williams, and Ms. Williams, having already made up her mind about the Defendant's innocence, shuts her down.  I can't talk to you about that.  I'm sure [B.C.'s mother] is like, Okay, you know, I understand, you can't violate privacy.  I just want to once again express my concern that the man who molested by daughter is walking about this apartment complex and there are other children here, and my daughter is here.  That's reasonable, right.  It's not ridiculous.  She didn't behave irrationally.  She didn't act like a crazy, lunatic person.

    5.  [Counsel for State]:  He describes a later encounter later on that afternoon the same way that [B.C.'s mother] did where he went up and apologized to her for her daughter not being where she was supposed to be.  Like endearing himself to her.  Wanting to sort of say, ["]Oh I'm sorry about that, I'm really a good guy, I usually don't let children follow me around.  Or wait, do I?["]  It sounds like it.  He has them around all the time, right . . . [a]nd he starts out saying, I ran.  It's almost like he was sitting around waiting for an opportunity talk to [B.C.'s mother] and apologize again, make sure it was okay, make sure everything is good, feel out the situation, see if she had reported anything.  Because he had gotten caught.  Because there actually was an eyewitness.  Maybe not to the actual crime, but definitely to the ending of it.

*E. Berating defense counsel.*  The Defendant cites two prosecutorial arguments in which he claims the prosecutor berated defense counsel while extolling the position of the State:

    1.  [Counsel for State]:  And the State is not hiding the ball.  There are certain evidentiary rules that allow us to play that forensic interview.  [Counsel for Defense] is aware of that.

[Counsel for Defense]:  Objection, Judge.

The Court:  Well, again, it's just argument.

[Counsel for State]:  Right.  Because I'm unethical.  [Counsel for Defense] is aware of that.  He knows what time it is.  He played that for you, right.  He thought there was going to be so much inconsistency in there that you couldn't possibly believe her.

    2. [Counsel for State]:  [Counsel for Defense] has an ethical obligation to defend his client.  That's his obligation.  Make no mistake.  If [the Defendant] confesses to him in the hallway this morning, his job is still to do the best job he can to defend him.  He's not constrained like the State is.

[Counsel for Defense]:  Objection, Judge.

The Court:  Well, you know, let's get away from that.

[Counsel for State]:  All right.  Well, it's fair game then obviously for [Counsel for Defense] to say I am unethical.  Obviously, the same rules don't apply.  It's okay to criticize the State and [the] way they're putting false allegations up.

As set out above, the Defendant raised contemporaneous objections to only three of the prosecutor's comments during the State's closing argument—once when the prosecutor vouched for the State's witnesses and twice when the prosecutor berated defense counsel. Concerning the failure to make a contemporaneous objection, our supreme court has stated:

[W]e stress that it is incumbent upon defense counsel to object contemporaneously whenever it deems the prosecution to be making improper argument.  A contemporaneous objection provides the trial court with an opportunity to assess the State's argument and to caution the prosecution and issue a curative instruction to the jury if necessary.

State v. Jordan, 325 S.W.3d 1, 57-58 (Tenn. 2010) (footnote omitted).  Generally, defense counsel's failure to object contemporaneously constitutes a waiver of the issue on appeal. Tenn. R. App. P. 36(a) (providing that an appellate court need not grant relief when a party failed to take reasonably available action to prevent or nullify an error); see State v. Little, 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992) (stating that a defendant's failure to object to the State's alleged misconduct during closing argument waives the issue).  There are, however, exceptions.

**Plain Error Analysis**

This Court has, in its discretion, reviewed allegations of non-constitutional prosecutorial misconduct as "plain error" even in the absence of a contemporaneous objection. See e.g., State v. Banks, 271 S.W.3d 90, 131-32 (Tenn. 2008) (stating "when flagrantly improper arguments are made, the trial court, with or without objection, should step in and take proper curative action"); State v. Butler, 795 S.W.2d 680, 683 (Tenn. Crim. App. 1990) (considering whether statements of prosecutor were plain error despite lack of objection by defendant); State v. Ashley Wheeler, No. W2013-02765-CCA-R3-CD, 2015 WL 1186363, at *3-8 (Tenn. Crim. App. Mar. 11, 2015) (granting relief under "plain error" despite the defendant's failure to raise a contemporaneous objection to the prosecutor's improper comments or assert the issue in a motion for new trial); see also Tenn. R. App. P. 36(b) (providing that "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal.") Plain error has been characterized as error that is obvious or egregious and has been "limited to those [errors] so objectionable that they should have been apparent to the trial judge or that strike at the fundamental fairness, honesty or public reputation of the trial." United States v. Rodriguez, 882 F.2d 1059, 1064 (6th Cir. 1989).

In State v. Adkisson, 899 S.W.2d 626 (Tenn. Crim. App. 1994), this court listed five factors to be applied to determine when alleged trial error constitutes "plain error":

> 1) the record must clearly establish what occurred at trial; 2) a clear and unequivocal rule of law must have been breached; 3) a substantial right of the accused must have been adversely affected; 4) the accused did not waive the issue for tactical reasons; and 5) consideration of the error is "necessary to do substantial justice."

Adkisson, 899 S.W.2d at 641-42. In State v. Smith, 24 S.W.3d 274, 282-83 (Tenn. 2000), our supreme court "formally" adopt this analysis, stating that "the Adkisson test provides a clear and meaningful standard for considering whether a trial error rises to the level of plain error in the absence of an objection." In applying the Adkisson test, the Smith court stated:

> We re-emphasize that the presence of all five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established. In addition, the "'plain error' must [have been] of such a great magnitude that it probably changed the outcome of the trial." Adkisson, 899 S.W.2d at 642.

<u>Smith</u>, 24 S.W.3d at 283. In <u>State v. Thomas</u>, 158 S.W.3d 361 (Tenn. 2005), our supreme court stated that, ultimately, a trial error must have had "an unfair prejudicial impact which undermined the fundamental fairness of the trial." <u>Thomas</u>, 158 S.W.3d at 413 (citing <u>Adkisson</u>, 899 S.W.2d at 642).

Although defense counsel's failure to contemporaneously object to instances of improper argument by the State would typically constitute a waiver of the issue, we conclude, under a plain error analysis, that the Defendant has established reversible error based upon the persistent pattern of prosecutorial misconduct in the State's closing argument. We will examine each of the factors from Adkisson as they relate to the Defendant's claims.

*1. The record must clearly establish what occurred at trial.*

The record in this case contains a transcript of the testimony, the exhibits, a transcript of the jury-out hearings, and a transcript of the arguments of counsel. For the purpose of our analysis, the record clearly shows what occurred at trial.

*2. A clear and unequivocal rule of law must have been breached.*

The trial court has wide discretion in controlling the course of arguments and will not be reversed absent an abuse of discretion. Terry v. State, 46 S.W.3d 147, 156 (Tenn. 2001). Closing argument by a prosecutor "is a valuable privilege that should not be unduly restricted." <u>State v. Bane</u>, 57 S.W.3d 411, 425 (Tenn. 2001). That said, Tennessee courts have recognized numerous prosecutorial arguments as improper. It is improper for a prosecutor to "engage in derogatory remarks, appeal to the prejudice of the jury, misstate the evidence, or make arguments not reasonably based on the evidence." State v. Bates, 804 S.W.2d 868, 881 (Tenn. 1991). In State v. Goltz, 111 S.W.3d 1 (Tenn. Crim. App. 2003), this court listed "five general areas of prosecutorial misconduct" that can arise during closing argument:

> (1) intentionally misleading or misstating the evidence;
>
> (2) expressing a personal belief or opinion as to the truth or falsity of the evidence or defendant's guilt;
>
> (3) making statements calculated to inflame the passions or prejudices of the jury;

(4) injecting broader issues than the guilt or innocence of the accused; and

(5) intentionally referring to or arguing facts outside the record that are not matters of common public knowledge.

Goltz, 111 S.W.3d at 6.

"In determining whether statements made in closing argument constitute reversible error, it is necessary to determine whether the statements were improper and, if so, whether the impropriety affected the verdict." State v. Pulliam, 950 S.W.2d 360, 367 (Tenn. Crim. App. 1996). In Judge v. State, 539 S.W.2d 340 (Tenn. Crim. App. 1976), this court listed five factors to be considered when determining whether the improper conduct of a prosecutor affected the verdict to the prejudice of the defendant. We will consider each the factors listed in Judge in making this determination.

## Judge Factors

*A. The conduct complained of viewed in context and in light of the facts and circumstances of the case.* The improper comments by the prosecution were not "isolated utterances," but rather, a "reoccurring theme throughout [the] entire argument." See Goltz, 111 S.W.3d at 9. As mentioned previously, and as will be discussed in factor *E.* below, this case presented many difficulties for the State.

*B. The curative measures undertaken by the court and the prosecution.* As mentioned previously, there were four objections made by the defense counsel, three of which occurred during the State's closing argument. The objections made by the Defendant were not specifically sustained or overruled by the trial court. For example, [Counsel for Defense]'s first objection during the State's summation was met with a ruling of "Well, again, it's just argument." As part of the second objection, [Counsel for Defense] asked to approach. [Counsel for State] responded, "It's closing argument." The trial court said, "I know what it is. All right, [l]et's approach." In response to [Counsel for Defense]'s third objection, [Counsel for State] stated, "It was open season on my ethical conduct, Your Honor." The trial court stated, "I know." [Counsel for State] responded, "I'm responding to that." The trial court said, "All right. Move on." By not ruling on the objections, the trial court effectively overruled them. Following the objections, the trial court took no curative measures and provided no curative instructions to the jury.[9]

---

[9] The jury was given the pattern instruction regarding statements, argument, and remarks of counsel and the pattern instruction concerning rulings on objections.

*C. The intent of the prosecutor in making the improper statement.* Determining someone's intent is difficult. However, as mentioned above, it is clear from the record that the improper comments during closing summation were not "isolated utterances by the prosecutor." Goltz, 111 S.W.3d at 9. We can glean from a cold record that several of the prosecutor's arguments to the jury were in response to what she felt was an attack on her ethical duties. In responding to this perceived insult, she made numerous derogatory remarks and disparaged defense counsel. Other comments appear to have been made to bolster the testimony of her two witnesses, B.C. and B.C.'s mother, or to vouch for their credibility. The prosecutor also inserted matters outside the record into her argument to appeal to the jury's sense of community and understandable disdain and prejudice towards sexual crimes committed against children. She repeatedly asked the jury to send a message.

*D. The cumulative effect of the improper conduct and any other errors in the record.* Aside from the comments about the Defendant not testifying, no single prosecutorial statement the Defendant contends was improper, standing alone, would have unfairly and prejudicially undermined the fundamental fairness of the trial. However, by engaging in a persistent pattern of misconduct during closing argument, we believe that the cumulative effect of the prosecutor's statements deprived the Defendant of his right to a fair trial.

*E. The relative strength or weakness of the case.* We recognize that cases involving sexual offenses against children are difficult to prosecute, defend, and judge. Such cases often place great strain on all concerned. The younger the alleged victim, often the more difficult the case is to prove. In this case, the child could not identify in court the Defendant as the person who sexually assaulted her. What B.C.'s mother claimed B.C. initially told her and what B.C's mother told the police, does not correspond with what B.C. testified happened. B.C.'s testimony about the details of the two incidents differs somewhat from the statements in her forensic interview. The Defendant adamantly denied any inappropriate contact with B.C. in his initial interview by the detective. The detective that investigated the case and interrogated the Defendant was called as a witness by the defense. The tape recording of the interrogation was played to the jury by the defense. The forensic interview of B.C. was played to the jury by the defense. B.C.'s mother's testimony about the dollars given to B.C., the dollar given to B.C. and her brother, and the incident at Quizno's provided strong circumstantial evidence if believed by the jury. B.C., however, said her brother was not given a dollar by the Defendant. We say all of this not to determine the sufficiency of evidence, but rather to show the relative weaknesses and strengths of the State's case.

*3. A substantial right of the defendant must have been adversely affected.*

The Due Process Clause of the 5th and 14th Amendments to the United States Constitution and Article I, section 9 of the Tennessee Constitution affords the Defendant the

right to a fair trial free from improper comments by the prosecutor during closing argument. United States v. Gonzalez-Lopez, 548 U.S. 140 (2006); Johnson v. State, 38 S.W.3d 52 (Tenn. 2001). As noted above, our review of the record establishes that, in addition to her unconstitutional comments upon the Defendant's right not to testify, the prosecutor engaged in a persistent pattern of misconduct by making other improper arguments during closing summation, the cumulative effect of which adversely affected the Defendant's fundamental right to a fair trial.

*4. The defendant did not waive the issue for tactical reasons.*

It is clear from the record that the trial court gave considerable latitude to both sides during closing argument. The objections made by the State and the Defendant were typically greeted with a ruling of "it's just argument" or "move on." Although the Defendant may have decided that additional objections would be unproductive, it does not appear that there was any tactical reason for the Defendant's failing to make additional objections.

*5. Consideration of the error is "necessary to do substantial justice."*

Finally, our consideration of these errors is necessary to do substantial justice. In this case, the improper comments by the prosecutor were not "isolated utterances"; rather, they were a reoccurring theme throughout the entire argument from the prosecutor.

All five Adkisson factors have been established by the record before this Court. In sum, we conclude "that the prosecutor's improper comments were so egregious as to permeate the jury's verdict to the Appellant's detriment." Goltz, 111 S.W.3d at 9. We hold that the cumulative effect of the improper prosecutorial arguments prejudicially undermined the fundamental fairness of the trial. Adkisson, 899 S.W.2d at 642. The judgments of the trial court are reversed and set aside, and the case is remanded for a new trial. Having so ruled, we will not address the sufficiency of the evidence.

### III.  Conclusion

For the foregoing reasons, the judgments of the trial court are reversed, and the case is remanded for a new trial.

_____
ROBERT L. HOLLOWAY, JR., JUDGE